THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. ___-___-___-___

| | |
|---|---|
| HEATHER MURPHY, natural parent and guardian for Z.M., minor child,<br><br>Plaintiff,<br><br>v.<br><br>JOHNSTON COUNTY BOARD OF EDUCATION, DR. ANTHONY L. PARKER, Superintendent, SANDRA OLMSTEAD, and TODD HOLMES,<br><br>Defendants. | **VERIFIED COMPLAINT** |

Plaintiff Heather Murphy, the natural parent and guardian of Z.M., minor child (hereinafter "Plaintiff"), by and through undersigned counsel, complaining of the Defendants Johnston County Board of Education (hereinafter "Johnston County Board"), Dr. Anthony L. Parker (hereinafter "Defendant Dr. Parker"), Sandra Olmstead (hereinafter "Defendant Olmstead"), and Todd Holmes (hereinafter "Defendant Holmes") (collectively referred to herein as "Defendants"), hereby alleges and says as follows:

**JURISDICTION**

1. Plaintiff is a resident of Johnston County, North Carolina. She is the natural parent of Z.M., minor child, and the guardian for Z.M.

2. Z.M. is a minor child who attends the public schools in Johnston County. For a portion of the 2006-2007 school year, Z.M. was a second grader in Defendant Olmstead's class at West Smithfield Elementary School.

3. Z.M. has a qualified physical or mental impairment, as defined by the Rehabilitation Act of 1973, 29 U.S.C. § 794, that substantially limits one or more major life activities; Z.M. also has a record of such impairment, and is regarded as having such an impairment.

4. Z.M. is a qualified individual with a disability, as defined by the Americans with Disabilities Act, 42 U.S.C. 12131.

5. Defendant Johnston County Board represents the Johnston County Schools, a North Carolina public school system; Defendant Johnston County Board is a local educational agency and a political subdivision of the state.

6. Defendant Johnston County Board is a "local educational agency" as defined by the Rehabilitation Act of 1973, 29 U.S.C. § 794, and is a "public entity" as defined by the Americans with Disabilities Act, 42 U.S.C. § 12131.

7. Defendant Dr. Parker is the Superintendent of the Johnston County Schools and is, upon information and belief, a citizen and resident of Johnston County, North Carolina.

8. Upon information and belief, Defendant Olmstead is a citizen and resident of Johnston County, North Carolina.

9. Defendant Olmstead is employed by the Johnston County Board and serves as a second grade teacher at West Smithfield Elementary School.

10. Upon information and belief, Defendant Holmes is a citizen and resident of Johnston County, North Carolina.

11. Defendant Holmes is employed by the Johnston County Board and serves as the principal at West Smithfield Elementary School.

12. This Court has original jurisdiction over Plaintiff's claims for relief under Section 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 794 et al), and under Section 202 of the Americans with Disabilities Act (42 U.S.C. § 12131), pursuant to 28 U.S.C. § 1331, and pendent jurisdiction over all other claims in this Complaint.

**STATEMENT OF FACTS**

13. At the time of the events giving rise to this Complaint, Z.M. was an eight year old in second grade at West Smithfield Elementary in Johnston County. Z.M.'s teacher during the 2006-2007 school year at West Smithfield was Defendant Olmstead.

14. Z.M. has been diagnosed with an auditory processing disorder. Auditory processing disorders affect a person's ability to discriminate, recognize, remember, and/or comprehend information presented auditorally. Z.M. has an auditory processing deficit in the area of auditory closure. "Auditory closure" is the ability to identify missing or distorted portions of words and/or messages. This deficit causes Z.M. to misperceive spoken words, phrases, directions and instructions when speech is muffled, poorly articulated, distorted, or partially masked by other noises. This disability has impacted Z.M.'s education in fundamental ways.

15. Z.M. has a qualified physical or mental impairment, as defined by the Rehabilitation Act of 1973, 29 U.S.C. § 794, that substantially limits one or more major life activities; Z.M. also has a record of such impairment, and is regarded as having such an impairment.

16. Prior to the 2006-2007 school year, Z.M. was provided an educational plan pursuant to Section 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 794) (hereinafter, "504

Plan"). Z.M.'s 504 Plan called for, among other things, a quiet environment in which to take tests, and preferential seating in the classroom.

17. On or around November 2006, Plaintiff noticed that her child, Z.M., was no longer sleeping well. Z.M. began having bathroom accidents at night while he attempted to sleep, and he began complaining of stomach aches. In addition, Z.M. was fighting more with his siblings and saying hurtful things. Both the fighting and the hurtful comments were very much out of character for Z.M.

18. Around this time, Z.M. also began biting his fingernails, and trying to sleep with his parents.

19. On or around November 2006, Plaintiff learned that Z.M. failed a six-week math assessment test, which again was unusual for Z.M. When Plaintiff approached Defendant Olmstead about the unsatisfactory score, Plaintiff specifically asked Defendant Olmstead if Z.M. was given his modifications based on his 504 Plan. Defendant Olmstead, Z.M.'s teacher, responded to Plaintiff, "I haven't read it [the 504 Plan] yet." Plaintiff then asked the West Smithfield principal, Todd Holmes, for a meeting regarding Z.M.'s 504 Plan.

20. After Plaintiff requested a new 504 Plan meeting, the school's assistant principal had a difficult time finding Z.M.'s 504 Plan folder. In addition, Defendant Holmes never responded to Plaintiff regarding the new 504 Plan meeting that she had requested.

21. Defendant Holmes did not assist Plaintiff in arranging a new 504 Plan meeting, even after Plaintiff made him aware that Z.M.'s 504 Plan was not being implemented by Defendant Olmstead. Defendant Holmes was made aware that Defendant Olmstead had not even read Z.M.'s 504 Plan.

22. On January 11, 2007, Z.M.'s mother arranged a meeting with Defendant Olmstead. At this meeting, among other things, Defendant Olmstead stated to Z.M.'s mother that when she had asked Z.M. to bring her his *planner,* he made his "annoying stupid face," and instead brought his *folder*. Defendant Olmstead also stated that Z.M. would be doing fine if he wasn't so upset and sensitive in class. Another teacher was present at this meeting.

23. On the afternoon of January 11, 2007, Z.M. came home from school in great distress, saying that he no longer wanted to go to school because the kids laughed at him. Plaintiff asked Z.M. why the kids laughed at him and he explained that Defendant Olmstead sang a song called "[Z (the first name of the child)]'s La-La-Land Song."

24. Defendant Olmstead would also have the children sing the song to Z.M. and at Z.M.

25. The lyrics to "[Z]'s La-La-Land Song" were "[Z]'s World, [Z]'s World, he's in La-La-Land."

26. When Defendant Olmstead or the students would sing this song it would humiliate Z.M. Often, Z.M. would cry in class when the song was sung.

27. Z.M. often begged Defendant Olmstead to stop singing the song.

28. On certain occasions, Defendant Olmstead would insist that she sing the song to Z.M. on her own and without the participation of the other students.

29. After Z.M. recounted this story to Plaintiff, Plaintiff immediately called the parent of another child in the classroom and asked if she was aware of any activities in class that would upset Z.M. The parent of the other child called back later in distress and said that she was "so sorry," and that her son told her that when Z.M. would become distracted in the classroom, Defendant Olmstead sang "[Z]'s La-La-Land Song." The child was able to repeat the lyrics of

the song verbatim to his mother, and further told his mother that the kids would be instructed to sing along with Defendant Olmstead. The parent told Plaintiff that her child said that Z.M.'s face would redden and that he would cry and say "it's not funny," and that Defendant Olmstead would reply "oh, but it is [Z]."

30. The child also told his mother that when Z.M. would fail to hear Defendant Olmstead, she would say to the other students "class, what did I tell [Z] to do?" and that she would then call on one of the students and have the student explain the instruction to Z.M. that he, because of his disability, had failed to hear.

31. Plaintiff called two other parents, both of whom confirmed the material facts regarding the classroom incidents and Defendant Olmstead's treatment of Z.M. Another student told his mother that Defendant Olmstead called Z.M. "Pig Pen" because he was very disorganized, even though a lack of organization is consistent with Z.M.'s auditory closure disability.

32. This particular child said that some of the children in the class would not play with Z.M. any more because they did not want to be laughed at as Z.M. was being laughed at.

33. Plaintiff later discovered that Defendant Olmstead also referred to Z.M. as a "piece of furniture" when he did not respond to her instructions, which further embarrassed and humiliated him. Z.M. did not respond to Defendant Olmstead's instructions because of his disability: either he could not hear the teacher, or he could not process the auditory instructions.

34. Plaintiff called yet another parent of a child in the class a few days later. Among other things, the child reported that Z.M. would apologize to Defendant Olmstead on those occasions when he could not hear an instruction.

35. On certain occasions, after Defendant Olmstead sang the "La-La Land" song to Z.M. in class, Z.M. would put his head on his desk and cry. Defendant Olmstead would then stand over the eight year old boy and ask, "have you had enough yet, [Z]?"

36. Upon information and belief, Plaintiff also discovered that Defendant Olmstead referred to another student with a urinary issue as "potty pants."

37. When Plaintiff and her husband discovered this humiliating and abusive treatment, they immediately removed Z.M. permanently from West Smithfield Elementary.

38. Plaintiff and her husband filed a formal complaint with the Johnston County Board on or around January 12, 2007, demanding, among other things, to have Z.M. transferred to another school away from Defendant Olmstead. They then went to West Smithfield to attempt to meet with Principal Holmes, but he would not meet with them on that day.

39. On or around January 17, 2007, Plaintiff took Z.M. for a check-up with Dr. George Auman, a pediatrician with White Oak Pediatrics in Wake County. Dr. Auman has been a pediatrician for over thirty four years in Raleigh, North Carolina. Dr. Auman stated in a letter that he was "shocked and dismayed" by the treatment Z.M. reportedly received in Defendant Olmstead's classroom. Dr. Auman, in a letter to Ed Croom, assistant superintendent of the Johnston County Board, recommended that Z.M., for his mental health and educational benefit, "be allowed to change schools as soon as possible." Dr. Auman ended his letter by stating that he would never have made such a recommendation without "firm conviction," and that he had never made such a recommendation for any other child in his many years as a pediatrician. A copy of Dr. Auman's letter is attached to this Complaint as Exhibit A and incorporated herein by reference.

40. Dr. Auman also recommended that Z.M. be treated by a child psychologist based on the likelihood of psychological and emotional damage suffered by Z.M. based on the conduct of Defendant Olmstead and the school system.

41. Plaintiff immediately sought out treatment from Linda Silber, Ph.D., of Silber Psychological Services. Dr. Silber stated that when she first met Z.M., he was a "mess," was "having trouble focusing, was becoming aggressive, crying and experiencing heightened sleep difficulties." A copy of the Linda Silber's letter regarding Z.M. is attached to this Complaint as Exhibit B and incorporated herein by reference.

42. Dr. Silber began treatment with Z.M. soon after his diagnostic visit. Nevertheless, Dr. Silber noted that even months later, Z.M. continued to show inappropriate remorse over events that had occurred. Dr. Silber referred to the abuse Z.M. received from Defendant Olmstead as a "humiliating experience and had an intensely negative impact on [Z] resulting in obvious behavioral changes." Exhibit B.

43. Dr. Silber also noted in her Treatment Plan Form that Z.M.'s suffered from post-traumatic stress disorder.

44. Plaintiff and her husband arranged for treatment with Dr. Silber as often as they could, but the costly sessions had to be postponed in the summer and early fall of 2007. Z.M. resumed treatment in November 2007, and his treatment continues.

45. The Human Resources Department of the Johnston County Board conducted an investigation into the matter and contacted Plaintiff on or around January 26, 2007. According to the Plaintiff, the HR official reported that Defendant Olmstead did not deny any of the allegations made by Plaintiff or Z.M. According to the official, Defendant Olmstead described her behavior as an "error in judgment."

46. Z.M. was eventually permitted to transfer to Polenta Elementary School in the Johnston County School System.

47. Z.M. has been damaged as a result of the willful abuse by Defendants.

48. Among other things, Defendant Olmstead's conduct caused severe emotional distress to Z.M., as more fully described in this Complaint. Z.M.'s severe emotional distress includes but is not limited to post-traumatic stress disorder, severe anxiety, phobias, and other severe and disabling emotional and mental conditions recognized by trained professionals.

49. Plaintiff, on behalf of Z.M., seeks to recover for Z.M. all available damages from Defendants resulting from the injuries inflicted by Defendants.

**FIRST CLAIM FOR RELIEF**
**(Non-Compliance with Section 504 of the Rehabilitation Act of 1973, as to all Defendants)**

50. The allegations set forth in Paragraph Nos. 1 through 49 above are realleged herein by reference as if fully set forth.

51. Z.M. has a qualified physical or mental impairment, as defined by the Rehabilitation Act of 1973, 29 U.S.C. § 794, that substantially limits one or more major life activities; Z.M. also has a record of such impairment, and is regarded as having such an impairment.

52. As more fully set forth above, Z.M. has been diagnosed with an auditory processing disorder. Auditory processing disorders affect a person's ability to discriminate, recognize, remember, and/or comprehend information presented auditorally. Z.M. has an auditory processing deficit in the area of auditory closure. "Auditory closure" is the ability to identify missing or distorted portions of words and/or messages. This deficit causes Z.M. to misperceive spoken words, phrases, directions and instructions when speech is muffled, poorly

articulated, distorted, or partially masked by other noises. This disability has impacted Z.M.'s education in fundamental ways.

53. Z.M. was provided an educational plan pursuant to Section 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 794 et al). Z.M.'s 504 Plan called for, among other things, a quiet environment in which to take tests, and preferential seating in the classroom.

54. On or around November 2006, Plaintiff noticed that Z.M. was no longer sleeping well. Z.M. began having bathroom accidents at night while he slept and often complained of stomach aches. In addition, Z.M. was fighting more with his siblings, which was out of character for Z.M. Z.M. also began biting his fingernails and trying to sleep with his parents.

55. On or around November 2006, Z.M. failed a six-week math assessment test, which was unusual for Z.M. When Plaintiff approached Z.M.'s teacher, Defendant Olmstead, about the unsatisfactory score, Plaintiff specifically asked Defendant Olmstead if Z.M. was given his modifications based on the 504 Plan put in place pursuant to Section 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 794).

56. Defendant Olmstead stated to Plaintiff, "I haven't read it [the 504 Plan] yet." Plaintiff then asked the West Smithfield principal, Defendant Holmes, for a meeting regarding Z.M.'s 504 Plan.

57. After Plaintiff requested a new 504 Plan meeting, the school's assistant principal had a difficult time finding Z.M.'s 504 Plan folder. In addition, Principal Holmes never responded to Plaintiff regarding the new 504 Plan meeting she had requested.

58. Defendant Holmes did not assist Plaintiff in arranging a new 504 Plan meeting, even after Plaintiff made him aware that Z.M.'s 504 Plan was not being implemented by

Defendant Olmstead. Defendant Holmes was made aware that Defendant Olmstead had not even read Z.M.'s 504 Plan.

59. On January 11, 2007, Z.M.'s mother arranged a meeting with Defendant Olmstead. At this meeting, among other things, Defendant Olmstead stated to Z.M.'s mother that when she had asked Z.M. to bring her his *planner,* he made his "annoying stupid face," and instead brought his *folder*. Defendant Olmstead also stated that Z.M. would be doing fine if he wasn't so upset and sensitive in class. Another teacher was present at this meeting.

60. On the afternoon of January 11, 2007, Z.M. came home from school in great distress, saying that he no longer wanted to go to school because the kids laughed at him. Plaintiff asked Z.M. why the kids laughed at him and he explained that Defendant Olmstead sang a song called "[Z (the first name of the child)]'s La-La-Land Song." The lyrics to "[Z]'s La-La-Land Song" were "[Z]'s World, [Z]'s World, he's in La-La-Land."

61. When Defendant Olmstead and/or the students would sing this song, it would humiliate Z.M. Often, Z.M. would cry in class when the song was sung.

62. Z.M. often begged Defendant Olmstead to stop singing the song.

63. Defendant Olmstead would have the children sing the song to Z.M. and at Z.M.

64. On certain occasions, Defendant Olmstead would insist that she sing the song to Z.M. on her own and without the participation of the other students.

65. Plaintiff later discovered that Defendant Olmstead also referred to Z.M. as a "piece of furniture" when he did not respond to her instructions, which further embarrassed and humiliated him. Z.M. did not respond to Defendant Olmstead's instructions because of his disability: either he could not hear the teacher, or he could not process the auditory instructions.

66. Defendant Olmstead also referred to Z.M. as "Pig Pen." Z.M.'s lack of organizational skills was a direct result of his disability.

67. Other students in the class told their parents that they did not want to play with Z.M. for fear that they would be singled out and embarrassed in the same way that Z.M. was being singled out and embarrassed.

68. On certain occasions, after Defendant Olmstead sang the "La-La Land" song to Z.M. in class, Z.M. would put his head on his desk and cry. Defendant Olmstead would then stand over the eight year old boy and ask, "have you had enough yet, [Z]?"

69. Z.M. is a qualified individual with a disability in the United States, as defined under Section 705(20) of the Rehabilitation Act of 1973.

70. Z.M. was excluded from participation in, and denied the benefits of, the educational opportunities at West Smithfield Elementary, through the school's failure to process, review, and implement Z.M.'s 504 Plan.

71. In addition, Z.M. was excluded from participation in, and denied the benefits of, the educational opportunities at West Smithfield Elementary, through the humiliating and destructive actions of his teacher, Defendant Olmstead, an employee of Defendant Johnston County Board.

72. In addition, Z.M. was excluded from participation in, and denied the benefits of, the educational opportunities at West Smithfield Elementary, through the actions of the school principal, Defendant Holmes, an employee of Defendant Johnston County Board.

73. Z.M. was subject to discrimination because of his disability while attempting to participate in the program or activity of public education at West Smithfield Elementary.

74. A public school education is a program or activity as defined by the Rehabilitation Act of 1973.

75. Defendants violated the express language of the Rehabilitation Act with their treatment and abuse of Z.M.

76. As a direct and proximate result of Defendants' violations of the Rehabilitation Act, Plaintiff, on behalf of Z.M., has been damaged in an amount as yet undetermined.

77. Plaintiff is entitled to all equitable and legal relief available under the Rehabilitation Act, including but not limited to full implementation of the 504 Plan, plus all compensatory damages.

78. Plaintiff is entitled to recover these amounts and all other relief for Z.M. from Defendants.

79. Plaintiff is also entitled to recover reasonable attorneys' fees as provided by the Rehabilitation Act of 1973.

## SECOND CLAIM FOR RELIEF
**(Violations of Section 504 of the Rehabilitation Act of 1973, as to all Defendants)**

80. The allegations set forth in Paragraph Nos. 1 through 79 above are realleged herein by reference as if fully set forth.

81. Z.M. has a qualified physical or mental impairment, as defined by the Rehabilitation Act of 1973, 29 U.S.C. § 794, that substantially limits one or more major life activities; Z.M. also has a record of such impairment, and is regarded as having such an impairment.

82. As more fully set forth above, Z.M. has been diagnosed with an auditory processing disorder. Auditory processing disorders affect a person's ability to discriminate, recognize, remember, and/or comprehend information presented auditorally. Z.M. has an

auditory processing deficit in the area of auditory closure. "Auditory closure" is the ability to identify missing or distorted portions of words and/or messages. This deficit causes Z.M. to misperceive spoken words, phrases, directions and instructions when speech is muffled, poorly articulated, distorted, or partially masked by other noises. This disability has impacted Z.M.'s education in fundamental ways.

83. Z.M. was provided an educational plan pursuant to Section 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 794 et al). Z.M.'s 504 Plan called for, among other things, a quiet environment in which to take tests, and preferential seating in the classroom.

84. On or around November 2006, Plaintiff noticed that Z.M. was no longer sleeping well. Z.M. began having bathroom accidents at night while he slept and often complained of stomach aches. In addition, Z.M. was fighting more with his siblings, which was out of character for Z.M. Z.M. also began biting his fingernails and trying to sleep with his parents.

85. On or around November 2006, Z.M. failed a six-week math assessment test, which was unusual for Z.M. When Plaintiff approached Z.M.'s teacher, Defendant Olmstead, about the unsatisfactory score, Plaintiff specifically asked Defendant Olmstead if Z.M. was given his modifications based on the 504 Plan put in place pursuant to Section 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 794).

86. Defendant Olmstead stated to Plaintiff, "I haven't read it [the 504 Plan] yet." Plaintiff then asked the West Smithfield principal, Defendant Holmes, for a meeting regarding Z.M.'s 504 Plan.

87. After Plaintiff requested a new 504 Plan meeting, the school's assistant principal had a difficult time finding Z.M.'s 504 Plan folder. In addition, Defendant Holmes never responded to Plaintiff regarding the new 504 Plan meeting she had requested.

88. Defendant Holmes did not assist Plaintiff in arranging a new 504 Plan meeting, even after Plaintiff made him aware that Z.M.'s 504 Plan was not being implemented by Defendant Olmstead. Defendant Holmes was made aware that Defendant Olmstead had not even read Z.M.'s 504 Plan.

89. On January 11, 2007, Z.M.'s mother arranged a meeting with Defendant Olmstead. At this meeting, among other things, Defendant Olmstead stated to Z.M.'s mother that when she had asked Z.M. to bring her his *planner,* he made his "annoying stupid face," and instead brought his *folder*. Defendant Olmstead also stated that Z.M. would be doing fine if he wasn't so upset and sensitive in class. Another teacher was present at this meeting.

90. On the afternoon of January 11, 2007, Z.M. came home from school in great distress, saying that he no longer wanted to go to school because the kids laughed at him. Plaintiff asked Z.M. why the kids laughed at him and he explained that Defendant Olmstead sang a song called "[Z (the first name of the child)]'s La-La-Land Song." The lyrics to "[Z]'s La-La-Land Song" were "[Z]'s World, [Z]'s World, he's in La-La-Land."

91. When Defendant Olmstead and/or the students would sing this song, it would humiliate Z.M. Often, Z.M. would cry in class when the song was sung.

92. Z.M. often begged Defendant Olmstead to stop singing the song.

93. Defendant Olmstead would have the children sing the song to Z.M. and at Z.M.

94. On certain occasions, Defendant Olmstead would insist that she sing the song to Z.M. on her own and without the participation of the other students.

95. Plaintiff later discovered that Defendant Olmstead also referred to Z.M. as a "piece of furniture" when he did not respond to her instructions, which further embarrassed and

humiliated him. Z.M. did not respond to Defendant Olmstead's instructions because of his disability: either he could not hear the teacher, or he could not process the auditory instructions.

96. Defendant Olmstead also referred to Z.M. as "Pig Pen." Z.M.'s lack of organizational skills was a direct result of his disability.

97. Other students in the class told their parents that they did not want to play with Z.M. for fear that they would be singled out and embarrassed in the same way that Z.M. was being singled out and embarrassed.

98. On certain occasions, after Defendant Olmstead sang the "La-La Land" song to Z.M. in class, Z.M. would put his head on his desk and cry. Defendant Olmstead would then stand over the eight year old boy and ask, "have you had enough yet, [Z]?"

99. Z.M. is a qualified individual with a disability in the United States, as defined under Section 705(20) of the Rehabilitation Act of 1973.

100. Z.M. was excluded from participation in, and denied the benefits of, the educational opportunities at West Smithfield Elementary, through the school's failure to process, review, and implement Z.M.'s 504 Plan.

101. In addition, Z.M. was excluded from participation in, and denied the benefits of, the educational opportunities at West Smithfield Elementary, through the humiliating and destructive actions of his teacher, Defendant Olmstead, an employee of Defendant Johnston County Board.

102. In addition, Z.M. was excluded from participation in, and denied the benefits of, the educational opportunities at West Smithfield Elementary, through the actions of the school principal, Defendant Holmes, an employee of Defendant Johnston County Board.

103. Z.M. was subject to discrimination because of his disability while attempting to participate in the program or activity of public education at West Smithfield Elementary.

104. A public school education is a program or activity as defined by the Rehabilitation Act of 1973.

105. Defendants violated the express language of the Rehabilitation Act with their treatment and abuse of Z.M.

106. As a direct and proximate result of Defendants' violations of the Rehabilitation Act, Plaintiff, on behalf of Z.M., has been damaged in an amount as yet undetermined.

107. Plaintiff is entitled to all equitable and legal relief available under the Rehabilitation Act.

108. Plaintiff is entitled to recover these amounts and all other relief for Z.M. from Defendants.

109. Plaintiff is also entitled to recover reasonable attorneys' fees as provided by the Rehabilitation Act of 1973.

**<u>THIRD CLAIM FOR RELIEF</u>**
**(Violations of Section 202 of the Americans with Disabilities Act, as to all Defendants)**

110. The allegations set forth in Paragraph Nos. 1 through 109 above are realleged herein by reference as if fully set forth.

111. Z.M. has a qualified physical or mental impairment, as defined by the Rehabilitation Act of 1973, 29 U.S.C. § 794, that substantially limits one or more major life activities; Z.M. also has a record of such impairment, and is regarded as having such an impairment.

112. As more fully set forth above, Z.M. has been diagnosed with an auditory processing disorder. Auditory processing disorders affect a person's ability to discriminate,

recognize, remember, and/or comprehend information presented auditorally. Z.M. has an auditory processing deficit in the area of auditory closure. "Auditory closure" is the ability to identify missing or distorted portions of words and/or messages. This deficit causes Z.M. to misperceive spoken words, phrases, directions and instructions when speech is muffled, poorly articulated, distorted, or partially masked by other noises. This disability has impacted Z.M.'s education in fundamental ways.

113. Z.M. was provided an educational plan pursuant to Section 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 794 et al). Z.M.'s 504 Plan called for, among other things, a quiet environment in which to take tests, and preferential seating in the classroom.

114. On or around November 2006, Plaintiff noticed that Z.M. was no longer sleeping well. Z.M. began having bathroom accidents at night while he slept, and often complained of stomach aches. In addition, Z.M. was fighting more with his siblings, which was out of character for Z.M. Z.M. also began biting his fingernails and trying to sleep with his parents.

115. On or around November 2006, Z.M. failed a six-week math assessment test, which was unusual for Z.M. When Plaintiff approached Z.M.'s teacher, Defendant Olmstead, about the unsatisfactory score, Plaintiff specifically asked Defendant Olmstead if Z.M. was given his modifications based on the 504 Plan put in place pursuant to Section 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 794).

116. Defendant Olmstead stated to Plaintiff, "I haven't read it [the 504 Plan] yet." Plaintiff then asked the West Smithfield principal, Defendant Holmes, for a meeting regarding Z.M.'s 504 Plan.

117. After Plaintiff requested a new 504 Plan meeting, the school's assistant principal had a difficult time finding Z.M.'s 504 Plan folder. In addition, Defendant Holmes never responded to Plaintiff regarding the new 504 Plan meeting she had requested.

118. Defendant Holmes did not assist Plaintiff in arranging a new 504 Plan meeting, even after Plaintiff made him aware that Z.M.'s 504 Plan was not being implemented by Defendant Olmstead. Defendant Holmes was made aware that Defendant Olmstead had not even read Z.M.'s 504 Plan.

119. On January 11, 2007, Z.M.'s mother arranged a meeting with Defendant Olmstead. At this meeting, among other things, Defendant Olmstead stated to Z.M.'s mother that when she had asked Z.M. to bring her his *planner,* he made his "annoying stupid face," and instead brought his *folder.* Defendant Olmstead also stated that Z.M. would be doing fine if he wasn't so upset and sensitive in class. Another teacher was present at this meeting.

120. On the afternoon of January 11, 2007, Z.M. came home from school in great distress, saying that he no longer wanted to go to school because the kids laughed at him. Plaintiff asked Z.M. why the kids laughed at him and he explained that Defendant Olmstead sang a song called "[Z (the first name of the child)]'s La-La-Land Song." The lyrics to "[Z]'s La-La-Land Song" were "[Z]'s World, [Z]'s World, he's in La-La-Land."

121. When Defendant Olmstead and/or the students would sing this song, it would humiliate Z.M. Often, Z.M. would cry in class when the song was sung.

122. Z.M. often begged Defendant Olmstead to stop singing the song.

123. Defendant Olmstead would have the children sing the song to Z.M. and at Z.M.

124. On certain occasions, Defendant Olmstead would insist that she sing the song to Z.M. on her own and without the participation of the other students.

125. Plaintiff later discovered that Defendant Olmstead also referred to Z.M. as a "piece of furniture" when he did not respond to her instructions, which further embarrassed and humiliated him. Z.M. did not respond to Defendant Olmstead's instructions because of his disability: either he could not hear the teacher, or he could not process the auditory instructions.

126. Defendant Olmstead also referred to Z.M. as "Pig Pen." Z.M.'s lack of organizational skills was a direct result of his disability.

127. Other students in the class told their parents that they did not want to play with Z.M. for fear that they would be singled out and embarrassed in the same way that Z.M. was being singled out and embarrassed.

128. On certain occasions, after Defendant Olmstead sang the "La-La Land" song to Z.M. in class, Z.M. would put his head on his desk and cry. Defendant Olmstead would then stand over the eight year old boy and ask, "have you had enough yet, [Z]?"

129. Z.M. is a qualified individual with a disability, as defined by the Americans with Disabilities Act, 42 U.S.C. 12131.

130. Defendant Johnston County Board represents the Johnston County Schools, which is a North Carolina public school system and a public entity.

131. Z.M. was excluded from participation in, and denied the benefits of, the educational opportunities at West Smithfield Elementary, through the school's failure to process, review, and implement Z.M.'s 504 Plan.

132. In addition, Z.M. was excluded from participation in, and denied the benefits of, the services, programs, and activities at West Smithfield Elementary, through the humiliating and abusive actions of his teacher, Defendant Olmstead, an employee of Defendant Johnston County Board.

133. In addition, Z.M. was excluded from participation in, and denied the benefits of, the services, programs, and activities at West Smithfield Elementary, through the actions of the school principal, Defendant Holmes, an employee of Defendant Johnston County Board.

134. Z.M. was also subject to discrimination because of his disability while attempting to participate in the program or activity of public education at West Smithfield Elementary.

135. Defendants violated the Americans with Disabilities Act with their treatment and abuse of Z.M.

136. As a direct and proximate result of Defendants' violations of the Americans with Disabilities Act, Plaintiff, on behalf of Z.M., has been damaged in an amount as yet undetermined.

137. Plaintiff is entitled to recover these amounts for Z.M. from Defendants pursuant to 42 U.S.C. § 12133.

138. Plaintiff is also entitled to recover reasonable attorneys' fees as provided by the ADA.

## FOURTH CLAIM FOR RELIEF
## (Intentional Infliction of Emotional Distress as to Defendant Olmstead)

139. The allegations set forth in Paragraph Nos. 1 through 138 above are realleged herein by reference as if fully set forth.

140. As more fully set forth above, Z.M. has been diagnosed with an auditory processing disorder. Auditory processing disorders affect a person's ability to discriminate, recognize, remember, and/or comprehend information presented auditorally. Z.M. has an auditory processing deficit in the area of auditory closure. "Auditory closure" is the ability to identify missing or distorted portions of words and/or messages. This deficit causes Z.M. to misperceive spoken words, phrases, directions and instructions when speech is muffled, poorly

articulated, distorted, or partially masked by other noises. This disability has impacted Z.M.'s education in fundamental ways.

141. Z.M. was provided an educational plan pursuant to Section 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 794 et al). Z.M.'s 504 Plan called for, among other things, a quiet environment in which to take tests, and preferential seating in the classroom.

142. On or around November 2006, Plaintiff noticed that Z.M. was no longer sleeping well. Z.M. began having bathroom accidents at night while he slept and often complained of stomach aches. In addition, Z.M. was fighting more with his siblings, which was out of character for Z.M. He also began biting his fingernails and trying to sleep with his parents.

143. On or around November 2006, Z.M. failed a six-week math assessment test, which was unusual for Z.M. When Plaintiff approached Z.M.'s teacher, Defendant Olmstead, about the unsatisfactory score, Plaintiff specifically asked Defendant Olmstead if Z.M. was given his modifications based on the 504 Plan put in place pursuant to Section 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 794).

144. Defendant Olmstead stated to Plaintiff, "I haven't read it [the 504 Plan] yet." Plaintiff then asked the West Smithfield principal, Defendant Holmes, for a meeting regarding Z.M.'s 504 Plan.

145. After Plaintiff requested a new 504 Plan meeting, the school's assistant principal had a difficult time finding Z.M.'s 504 Plan folder. In addition, Defendant Holmes never responded to Plaintiff regarding the new 504 Plan meeting she had requested.

146. Defendant Holmes did not assist Plaintiff in arranging a new 504 Plan meeting, even after Plaintiff made him aware that Z.M.'s 504 Plan was not being implemented by

Defendant Olmstead. Defendant Holmes was made aware that Defendant Olmstead had not even read Z.M.'s 504 Plan.

147. On January 11, 2007, Z.M.'s mother arranged a meeting with Defendant Olmstead. At this meeting, among other things, Defendant Olmstead stated to Z.M.'s mother that she had asked Z.M. to bring her his *planner,* he made his "annoying stupid face," and instead brought his *folder*. Defendant Olmstead also stated that Z.M. would be doing fine if he wasn't so upset and sensitive in class. Another teacher was present at this meeting.

148. On the afternoon of January 11, 2007, Z.M. came home from school in great distress, saying that he no longer wanted to go to school because the kids laughed at him. Plaintiff asked Z.M. why the kids laughed at him and he explained that Defendant Olmstead sang a song called "[Z (the first name of the child)]'s La-La-Land Song." The lyrics to "[Z]'s La-La-Land Song" were "[Z]'s World, [Z]'s World, he's in La-La-Land."

149. When Defendant Olmstead and/or the students would sing this song, it would humiliate Z.M. Often, Z.M. would cry in class when the song was sung.

150. Z.M. often begged Defendant Olmstead to stop singing the song.

151. Defendant Olmstead would have the children sing the song to Z.M. and at Z.M.

152. On certain occasions, Defendant Olmstead would insist that she sing the song to Z.M. on her own and without the participation of the other students.

153. Plaintiff later discovered that Defendant Olmstead also referred to Z.M. as a "piece of furniture" when he did not respond to her instructions, which further embarrassed and humiliated him. Z.M. did not respond to Defendant Olmstead's instructions because of his disability: either he could not hear the teacher, or he could not process the auditory instructions.

154. Defendant Olmstead also referred to Z.M. as "Pig Pen." Z.M.'s lack of organizational skills was a direct result of his disability.

155. Other students in the class told their parents that they did not want to play with Z.M. for fear that they would be singled out and embarrassed in the same way that Z.M. was being singled out and embarrassed.

156. On certain occasions, after Defendant Olmstead sang the "La-La Land" song to Z.M. in class, Z.M. would put his head on his desk and cry. Defendant Olmstead would then stand over the eight year old boy and ask, "have you had enough yet, [Z]?"

157. Defendant Olmstead engaged in extreme and outrageous conduct, conduct which exceeded all bounds usually tolerated by decent society, with her mistreatment and abuse of Z.M. in class.

158. Defendant Olmstead's conduct, as described above, was recklessly indifferent to the likelihood that it would cause severe emotional distress to Z.M.

159. Defendant Olmstead's conduct caused severe emotional distress to Z.M., as more fully described above. Z.M.'s severe emotional distress includes but is not limited to post-traumatic stress disorder, severe anxiety, phobias, and other severe and disabling emotional and mental conditions recognized by trained professionals.

160. As a direct and proximate result of Defendant Olmstead's mistreatment and abuse of Z.M., Plaintiff, on behalf of Z.M., has been damaged in an amount as yet undetermined.

161. Plaintiff is entitled to recover these amounts for Z.M. from Defendant Olmstead.

**<u>FIFTH CLAIM FOR RELIEF</u>**
**(Negligent Infliction of Emotional Distress as to all Defendants)**

162. The allegations set forth in Paragraph Nos. 1 through 161 above are realleged herein by reference as if fully set forth.

163. As more fully set forth above, Z.M. has been diagnosed with an auditory processing disorder. Auditory processing disorders affect a person's ability to discriminate, recognize, remember, and/or comprehend information presented auditorally. Z.M. has an auditory processing deficit in the area of auditory closure. "Auditory closure" is the ability to identify missing or distorted portions of words and/or messages. This deficit causes Z.M. to misperceive spoken words, phrases, directions and instructions when speech is muffled, poorly articulated, distorted, or partially masked by other noises. This disability has impacted Z.M.'s education in fundamental ways.

164. On or around November 2006, Plaintiff noticed that Z.M. was no longer sleeping well. Z.M. began having bathroom accidents at night while he slept and often complained of stomach aches. In addition, Z.M. was fighting more with his siblings, which was out of character for Z.M. Z.M. also began biting his fingernails and trying to sleep with his parents.

165. On or around November 2006, Z.M. failed a six-week math assessment test, which was unusual for Z.M. When Plaintiff approached Z.M.'s teacher, Defendant Olmstead, about the unsatisfactory score, Plaintiff specifically asked Defendant Olmstead if Z.M. was given his modifications based on the 504 Plan put in place pursuant to Section 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 794).

166. Defendant Olmstead stated to Plaintiff, "I haven't read it [the 504 Plan] yet." Plaintiff then asked the West Smithfield principal, Defendant Holmes, for a meeting regarding Z.M.'s 504 Plan.

167. After Plaintiff requested a new 504 Plan meeting, the school's assistant principal had a difficult time finding Z.M.'s 504 Plan folder. In addition, Defendant Holmes never responded to Plaintiff regarding the new 504 Plan meeting she had requested.

168. Defendant Holmes did not assist Plaintiff in arranging a new 504 Plan meeting, even after Plaintiff made him aware that Z.M.'s 504 Plan was not being implemented by Defendant Olmstead. Defendant Holmes was made aware that Defendant Olmstead had not even read Z.M.'s 504 Plan.

169. On January 11, 2007, Z.M.'s mother arranged a meeting with Defendant Olmstead. At this meeting, among other things, Defendant Olmstead stated to Z.M.'s mother that when she had asked Z.M. to bring her his *planner,* he made his "annoying stupid face," and instead brought his *folder*. Defendant Olmstead also stated that Z.M. would be doing fine if he wasn't so upset and sensitive in class. Another teacher was present at this meeting.

170. On the afternoon of January 11, 2007, Z.M. came home from school in great distress, saying that he no longer wanted to go to school because the kids laughed at him. Plaintiff asked Z.M. why the kids laughed at him and he explained that Defendant Olmstead sang a song called "[Z (the first name of the child)]'s La-La-Land Song." The lyrics to "[Z]'s La-La-Land Song" were "[Z]'s World, [Z]'s World, he's in La-La-Land."

171. When Defendant Olmstead and/or the students would sing this song, it would humiliate Z.M. Often, Z.M. would cry in class when the song was sung.

172. Z.M. often begged Defendant Olmstead to stop singing the song.

173. Defendant Olmstead would have the children sing the song to Z.M. and at Z.M.

174. On certain occasions, Defendant Olmstead would insist that she sing the song to Z.M. on her own and without the participation of the other students.

175. Plaintiff later discovered that Defendant Olmstead also referred to Z.M. as a "piece of furniture" when he did not respond to her instructions, which further embarrassed and

humiliated him. Z.M. did not respond to Defendant Olmstead's instructions because of his disability: either he could not hear the teacher, or he could not process the auditory instructions.

176. Defendant Olmstead also referred to Z.M. as "Pig Pen." Z.M.'s lack of organizational skills was a direct result of his disability.

177. Other students in the class told their parents that they did not want to play with Z.M. for fear that they would be singled out and embarrassed in the same way that Z.M. was being singled out and embarrassed.

178. On certain occasions, after Defendant Olmstead sang the "La-La Land" song to Z.M. in class, Z.M. would put his head on his desk and cry. Defendant Olmstead would then stand over the eight year old boy and ask, "have you had enough yet, [Z]?"

179. Defendant Olmstead engaged in negligent conduct with her mistreatment and abuse of Z.M.

180. Defendant Olmstead's negligent conduct caused severe emotional distress to Z.M., as more fully described above. Z.M.'s severe emotional distress includes but is not limited to post-traumatic stress disorder, severe anxiety, phobias, and other severe and disabling emotional and mental conditions recognized by trained professionals.

181. Defendant Olmstead's negligence was a proximate cause of Z.M.'s severe emotional distress.

182. As a direct and proximate result of Defendants' negligent conduct, specifically Defendant Olmstead's negligent mistreatment and abuse of Z.M., Plaintiff, on behalf of Z.M., has been damaged in an amount as yet undetermined.

183. Plaintiff is entitled to recover these amounts for Z.M. from Defendants.

**SIXTH CLAIM FOR RELIEF**
**(North Carolina State Constitutional Claims as to all Defendants)**

184. The allegations set forth in Paragraph Nos. 1 through 183 above are realleged herein by reference as if fully set forth.

185. Z.M. has a qualified physical or mental impairment, as defined by the Rehabilitation Act of 1973, 29 U.S.C. § 794, that substantially limits one or more major life activities; Z.M. also has a record of such impairment, and is regarded as having such an impairment.

186. As more fully set forth above, Z.M. has been diagnosed with an auditory processing disorder. Auditory processing disorders affect a person's ability to discriminate, recognize, remember, and/or comprehend information presented auditorally. Z.M. has an auditory processing deficit in the area of auditory closure. "Auditory closure" is the ability to identify missing or distorted portions of words and/or messages. This deficit causes Z.M. to misperceive spoken words, phrases, directions and instructions when speech is muffled, poorly articulated, distorted, or partially masked by other noises. This disability has impacted Z.M.'s education in fundamental ways.

187. Z.M. was provided an educational plan pursuant to Section 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 794 et al). Z.M.'s 504 Plan called for, among other things, a quiet environment in which to take tests, and preferential seating in the classroom.

188. On or around November 2006, Plaintiff noticed that Z.M. was no longer sleeping well. Z.M. began having bathroom accidents at night while he slept and often complained of stomachaches. In addition, Z.M. was fighting more with his siblings, which was out of character for Z.M. He also began biting his fingernails and trying to sleep at night with his parents.

189. On or around November 2006, Z.M. failed a six-week math assessment test, which was unusual for Z.M. When Plaintiff approached Z.M.'s teacher, Defendant Olmstead, about the unsatisfactory score, Plaintiff specifically asked Defendant Olmstead if Z.M. was given his modifications based on the 504 Plan put in place pursuant to Section 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 794).

190. Defendant Olmstead stated to Plaintiff, "I haven't read it [the 504 Plan] yet." Plaintiff then asked the West Smithfield principal, Defendant Holmes, for a meeting regarding Z.M.'s 504 Plan.

191. After Plaintiff requested a new 504 Plan meeting, the school's assistant principal had a difficult time finding Z.M.'s 504 Plan folder. In addition, Defendant Holmes never responded to Plaintiff regarding the new 504 Plan meeting that she had requested.

192. Defendant Holmes did not assist Plaintiff in arranging a new 504 Plan meeting, even after Plaintiff made him aware that Z.M.'s 504 Plan was not being implemented by Defendant Olmstead. Defendant Holmes was made aware that Defendant Olmstead had not even read Z.M.'s 504 Plan.

193. On January 11, 2007, Z.M.'s mother arranged a meeting with Defendant Olmstead. At this meeting, among other things, Defendant Olmstead stated to Z.M.'s mother that when she had asked Z.M. to bring her his *planner,* he made his "annoying stupid face," and instead brought his *folder*. Defendant Olmstead also stated that Z.M. would be doing fine if he wasn't so upset and sensitive in class. Another teacher was present at this meeting.

194. On the afternoon of January 11, 2007, Z.M. came home from school in great distress, saying that he no longer wanted to go to school because the kids laughed at him. Plaintiff asked Z.M. why the kids laughed at him and he explained that Defendant Olmstead sang

a song called "[Z (first name of the child)]'s La-La-Land Song." The lyrics to "[Z]'s La-La-Land Song" were "[Z]'s World, [Z]'s World, he's in La-La-Land."

195. When Defendant Olmstead or the students would sing this song, it would humiliate Z.M. Often, Z.M. would cry in class when the song was sung.

196. Z.M. often begged Defendant Olmstead to stop singing the song.

197. Defendant Olmstead would have the children sing the song to Z.M. and at Z.M.

198. On certain occasions, Defendant Olmstead would insist that she sing the song to Z.M. on her own and without the participation of the other students.

199. Plaintiff later discovered that Defendant Olmstead also referred to Z.M. as a "piece of furniture" when he did not respond to her instructions, which further embarrassed and humiliated him.

200. Defendant Olmstead also referred to Z.M. as "Pig Pen."

201. Other students in the class told their parents that they did not want to play with Z.M. for fear that they would be singled out and embarrassed in the same way that Z.M. was being singled out and embarrassed.

202. On certain occasions, after Defendant Olmstead sang the "La-La Land" song to Z.M. in class, Z.M. would put his head on his desk and cry. Defendant Olmstead would then stand over the eight year old boy and ask, "have you had enough yet, [Z]?"

203. Z.M. was excluded from participation in, and denied the benefits of, the educational opportunities at West Smithfield Elementary, through the humiliating and destructive actions of his teacher, Defendant Olmstead.

204. Z.M. was subject to discrimination because of his disability while attempting to participate in public education at West Smithfield Elementary.

205. Defendants in this case have violated the North Carolina state constitutional provision Article I, Section 15, which states that "[t]he people have a right to the privilege of education, and it is the duty of the State to guard and maintain that right."

206. Defendants in this case have violated the North Carolina state constitutional provision Article I, Section 19, which states in relevant part that "[n]o person shall be . . . disseized of his . . . privileges, or . . . in any manner deprived of his . . . property, but by the law of the land. No person shall be denied the equal protection of the laws . . . ."

207. Defendants in this case have violated the North Carolina state constitutional provision Article IX, Section 1, which states that "[r]eligion, morality, and knowledge being necessary to good government and the happiness of mankind, schools, libraries, and the means of education shall be forever encouraged."

208. Defendants have violated the North Carolina state constitutional provisions listed above with their actions toward, and mistreatment of, Z.M.

209. Plaintiff is entitled to bring this claim on behalf of Z.M. for violations of the North Carolina state constitution.

210. As a direct and proximate result of Defendants' violations of the North Carolina state constitutional provisions set forth above, Plaintiff, on behalf of Z.M., has been damaged in an amount as yet undetermined.

211. Plaintiff is entitled to recover these amounts for Z.M. from Defendants.

## SEVENTH CLAIM FOR RELIEF
**(Punitive Damages as to Defendant Olmstead)**

212. The allegations set forth in Paragraph Nos. 1 through 211 above are realleged herein by reference as if fully set forth.

213. The actions of Defendant Olmstead, as more fully set forth above, were intentional, deliberate, willful and wanton, malicious, and in complete and total disregard for the rights of Z.M.

214. Defendant Olmstead repeatedly sang a song in front of the class ridiculing Z.M. called "[Z (the first name of the child)]'s La-La-Land Song." The lyrics to "[Z]'s La-La-Land Song" were "[Z]'s World, [Z]'s World, he's in La-La-Land."

215. When Defendant Olmstead or the students would sing this song, it would humiliate Z.M. Often, Z.M. would cry in class when the song was sung.

216. Z.M. begged Defendant Olmstead to stop singing the song.

217. Defendant Olmstead would have the children sing the song to Z.M. and at Z.M.

218. On certain occasions, Defendant Olmstead would insist that she sing the song to Z.M. on her own and without the participation of the other students.

219. Plaintiff later discovered that Defendant Olmstead also referred to Z.M. as a "piece of furniture" when he did not respond to her instructions, which further embarrassed and humiliated him.

220. Defendant Olmstead also referred to Z.M. as "Pig Pen."

221. Other students in the class told their parents that they did not want to play with Z.M. for fear that they would be singled out and embarrassed in the same way that Z.M. was being singled out and embarrassed.

222. On certain occasions, after Defendant Olmstead sang the "La-La Land" song to Z.M. in class, Z.M. would put his head on his desk and cry. Defendant Olmstead would then stand over the eight year old boy and ask, "have you had enough yet, [Z]?"

223. Upon information and belief, Plaintiff also discovered that Defendant Olmstead referred to another student with a urinary issue as "potty pants."

224. The actions of Defendant Olmstead as described above were intentional, deliberate, willful and wanton, malicious, and in complete and total disregard for the rights of Z.M.

225. As a direct, legal, and proximate result of the intentional, deliberate, willful and wanton, malicious, threatening and intimidating conduct of Defendant Olmstead, Plaintiff, on behalf of Z.M., is entitled to recover punitive damages from Defendant Olmstead.

## DEMAND FOR JURY TRIAL

226. Plaintiff, on behalf of Z.M., the minor child, demands a trial by jury of all issues so triable.

**WHEREFORE**, Plaintiff prays the Court that:

1. Plaintiff have and recover from the Defendants all legal, equitable, and/or monetary damages Z.M. has incurred or that Z.M. will incur as a direct and proximate result of the violations of Section 504 of the Rehabilitation Act of 1973, and Section 202 of the Americans with Disabilities Act, said damages to be determined, with interest thereon from the date suit was filed;
2. Plaintiff have and recover from the Defendants all damages Z.M. has incurred or that Z.M. will incur as a direct and proximate result of the emotional distress intentionally and/or negligently inflicted on Z.M. by Defendants;
3. Plaintiff have and recover from the Defendants all damages Z.M. has incurred or that Z.M. will incur as a direct and proximate result of Defendants' violations of the North Carolina state constitution;

4. Plaintiff have and recover from the Defendants all reasonable attorneys' fees pursuant to the remedies provided in Section 504 of the Rehabilitation Act of 1973, as well as Section 202 of the Americans with Disabilities Act, and any other relevant provisions permitting an award of attorneys' fees;

5. Plaintiff have and recover punitive damages from Defendant Olmstead for her willful, wanton, and intentional conduct toward Z.M.; and

6. Plaintiff have and recover such other and further legal and/or equitable relief as this Court deems just and proper.

Respectfully submitted this the 20th day of March, 2008.

**HARRIS, WINFIELD, SARRATT & HODGES, LLP**

By: /s/ H. Clay Hodges
Donald J. Harris, #15902
H. Clay Hodges, #29270
225 Hillsborough Street, Suite 260
Raleigh, North Carolina 27603
Tel.: 919.546.8788
Fax: 919.546.8789
***Attorneys for the Plaintiff***

## VERIFICATION

Heather Murphy, being first duly sworn, deposes and says that she is the Plaintiff in the foregoing action; that she has read the foregoing Verified Complaint and knows the contents thereof; that the same is true of her own personal knowledge, except as to those matters alleged upon information and belief, and as to those matters she believes them to be true.

Heather L Murphy 3/20/08
HEATHER MURPHY

STATE OF NORTH CAROLINA

COUNTY OF WAKE

Sworn to and subscribed before me,
this the 20th day of March, 2008.

KATRINA ARRUDA
Notary Public
Wake County
State of North Carolina
My Commission Expires March 27, 2010

Katrina Arruda
Notary Public KATRINA ARRUDA

My commission expires: 3-27-2010